UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK HARDY,

        Petitioner,

                                    Case No. 13-cv-14324

v.

                                    HON. MARK A. GOLDSMITH

STEVEN RIVARD,

        Respondent.
_____/

**OPINION AND ORDER
(1) DENYING THE PETITION FOR WRIT OF HABEAS CORPUS (Dkt. 4); (2)
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY; AND (3) GRANTING
LEAVE TO APPEAL IN FORMA PAUPERIS**

## I.  INTRODUCTION

Petitioner Frank Hardy, presently confined at the St. Louis Correctional Facility in St. Louis, Michigan, filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. 4).  Petitioner challenges his conviction for first-degree premeditated murder, Mich. Comp. Laws § 750.316(1)(a); assault with intent to commit murder, Mich. Comp. Laws § 750.83; felon in possession of a firearm, Mich. Comp. Laws § 750.224f; and carrying or possessing a firearm when committing or attempting to commit a felony (felony-firearm)-second offense, Mich. Comp. Laws § 750.227b.  For the reasons stated below, the Court denies the petition for writ of habeas corpus.

## II.  BACKGROUND

Petitioner was convicted of the above charges following a jury trial in the Wayne County Circuit Court.  JuJuan Harrison testified that, on June 14, 2010, he worked as a barber at the barbershop at 9615 Harper in Detroit, Michigan.  He had been a barber there for seven or eight

years before he went to Georgia, but had just recently come back.  He had known the deceased, Demonte Thomas, from the barbershop for eight or nine years.  June 14 was a Monday and the barbershop was not open on Mondays.  On that day, Thomas called him on the phone and asked him to give him a haircut at the barbershop.  Harrison had just picked his friend DeAngelo Hatcher up from work in a rental car when he got the call from Thomas.  Initially, Harrison told Thomas that he was too busy that day to cut his hair, but Thomas kept calling him and pestering him until he finally gave in and told Thomas to wait for him on the porch of the barbershop. 06/07/2011 Trial Tr. at 113-116 (Dkt. 12-7).

When Harrison arrived at the barbershop, Thomas was on the porch with a tee shirt slung over his shoulder.  Harrison parked his rental car in front of the barbershop and used his key to open a grate, which had a padlock on it, and then the front door to get into the barbershop. Harrison let Thomas in first.  After Harrison turned the lights on, by flicking the light switch on the wall by the door, he turned to put a CD in the CD player that was on the counter to his left. Before Harrison could get the CD in the player, he heard Thomas say to him, "Jay, look up." Harrison looked in the mirror that was in front of him and saw Thomas in the mirror, along with a guy who was behind him holding a gray automatic handgun.  The man was coming from where there was a four-and-a-half-foot wall counter and a vending snack machine.  The man holding the gun was brown-skinned, with a little goatee, 5'6" to 5'8" tall, wearing a black hoodie and beige pants. The man said one thing, "Bitch," and then fired a shot.  Harrison ran out of the barbershop and across the street to the liquor store.  As Harrison was running, he heard several shots being fired at him, which made him think that he had been shot.  He did not know what happened to Thomas.

Once inside the liquor store, Harrison frantically said that a guy in the barbershop had

just tried to kill him, that he did not know how the guy had gotten in, and that Thomas must have set him up. Harrison asked people in the liquor store to check him to see if he had been shot. He had not been shot, even though the perpetrator had fired more than ten shots. Id. at 116-124.

Harrison picked Henry Brown's photograph out of a photo array, saying that he was 80% certain that he had picked the shooter. He was aware that Brown was then arrested for this incident, but released. Harrison viewed a live lineup in March of 2011 and told the officer conducting the lineup that it was either number two or number three. Petitioner was one of the two people identified. Id. at 147-150.

Detroit Police Evidence Technician Sergeant David Babcock testified that evidence found in an alley near the shooting included clothing and a firearm. Inside the clothing, he found several items that were folded up. One was a potato chip bag folded up neatly inside the pocket of the clothing. Another was a folded-up Fritos bag, and the third was a folded up page of a men's magazine. 06/08/2011 Trial Tr. at 57-59 (Dkt. 12-8). Babcock further testified that inside the barbershop building was a magazine called VIBE that had the exact page missing that he found folded up in the clothing. Also inside the barbershop was a vending machine with candy and chips of the same type found in the clothing. The vending machine appeared as though it had been pried open and there were empty spaces in the machine where items had been. In the alley, underneath a log, Babcock testified that a .45 caliber semi-automatic Bersa handgun had been found by other officers. Near the handgun was a pair of sweatpants, a sweatshirt, and gloves. Id. at 59-72.

Michigan State Police Lieutenant Robert May testified that he was a supervisor in the Latent Print Unit at the State Police Crime Lab in Northville, Michigan. 06/09/2011 Trial Tr. at 3-4 (Dkt. 12-9). One usable fingerprint was found on one of the Doritos bags. The fingerprint

3

was compared to the fingerprints cards of Demonte Thomas (the victim) and Henry Brown, and the fingerprint did not match the fingerprints of either of these two individuals. The fingerprint on the Doritos bag was then put into the Automated Fingerprint Identification System ("AFIS"), which is a database of fingerprints throughout the State of Michigan. AFIS is a computer, which searches the database for the latent prints fed into it. AFIS generated a system identification number that came back to Petitioner Frank Hardy. Officers then obtained Hardy's fingerprints through AFIS and compared them to the latent fingerprint from the Doritos bag and found that the latent print from the Doritos bag matched the right thumb of Frank Hardy. Id. at 16-21.

Catherine Maggert testified that, as a forensic scientist employed by the Michigan State Police at the State Police Crime Lab's Biology Unit in Northville, she received a number of items relative to this case. The items included a blood sample of Thomas, swabs from inside of a glove, swabs from the waistband and cuffs of a pair of sweatpants, swabs from the neck line and cuffs of a sweatshirt, and a known buccal swab from Brown. She was able to exclude Thomas and Brown as being the major donors of the DNA on the gloves, the sweatpants, and the sweatshirt. She then entered the DNA profile of the major donor of the gloves, the sweatpants, and the sweatshirt into the Combined DNA Index System ("CODIS"), which is a database maintained by the FBI of DNA profiles from persons who had been required by law to submit a DNA sample for the database. CODIS provided the name of Petitioner Frank Hardy as the major donor of the DNA on the gloves, the sweatpants, and the sweatshirt. Maggert further testified that she then received a buccal swab of Petitioner, which was obtained by Brandon Good. Maggert found that the DNA from the gloves, the sweatpants, and the sweatshirt matched the DNA of Frank Hardy. Id. at 106-125.

Maggert did statical calculations of what would be the probabilities of the DNA found on

the gloves, the sweatpants, and the sweatshirt belonging to another person besides Petitioner. For the DNA on the sweatpants, the probability was one in 4.511 billion for the Caucasian population, 19.5 million for the African-American population, and 3.265 billion for the Hispanic population. For the DNA on the gloves, the probability was one in 37.99 million for the Caucasian population, 306.3 million for the African-American population, and 39.62 billion for the Hispanic population. And for the DNA on the sweatshirt, the probability was one in 3.697 quintillion for the Caucasian population, 22.43 quadrillion for the African-American population, and 961.5 quadrillion billion for the Hispanic population. The difference in the statistical calculations between the various items was due to the fact that Maggert received more of a DNA profile for the sweatshirt and less for the other items. Id. at 126-128.

Petitioner's conviction was affirmed on appeal. People v. Hardy, No. 305234, 2013 WL 1137177, (Mich. Ct. App. Mar. 19, 2013), leave denied 834 N.W.2d 875 (Mich. 2013).

Petitioner seeks a writ of habeas corpus on the following grounds:[1]

    i.    "The trial court violated [Petitioner's] confrontation rights by allowing a surrogate fingerprint expert to testify regarding the findings of the analyst who actually conducted the analysis."

    ii.    "Trial counsel deprived [Petitioner] of his right to the effective assistance of counsel by failing to object to the denial of his right to confront the analyst who did the fingerprint analysis."

    iii.    "The trial court violated [Petitioner's] right to a public trial by closing the courtroom during jury selection and excluding everybody but the jury venire and two representatives of the

---

[1] Respondent contends that, because Petitioner failed to object at trial, several of Petitioner's claims are waived or procedurally defaulted. Petitioner argues that his trial counsel was ineffective for failing to object to these alleged errors. Ineffective assistance of counsel may establish cause for procedural default. Edwards v. Carpenter, 529 U.S. 446, 451-452 (2000). Given that the cause and prejudice inquiry for the procedural default issue merges with an analysis of the merits of Petitioner's defaulted claims, it would be more efficient to consider the merits of the claims. See Cameron v. Birkett, 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004).

victims (sic) families."

    iv.    "Trial counsel deprived [Petitioner] of his right to the effective assistance of counsel by failing to object to the denial of his right to a public trial when the court partially closed the courtroom during jury selection."

    v.    "[Petitioner] was denied his due process right to a fair and impartial trial by the prosecutor's misconduct, where the prosecutor withheld from defendant an investigation subpoena which was material to defendant's defense in violation of his state and federal constitutional rights."

    vi.    "The prosecutor's misconduct undermined the fairness of the trial, and rendered the verdict unreliable and deprived Petitioner of due process and an impartial trial by, jury as guaranteed by the federal and state constitutions."

    vii.    "Trial counsel was constitutionally ineffective throughout trial, which deprived [Petitioner] of his state and federal constitutional sixth and fourteenth amendment right to counsel and a[n] effective defense."

Pet. at 4, 6-7, 9, 11-13 (cm/ecf pages) (Dkt. 4).

## III.  STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

The Supreme Court has explained that a "federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Thus, the AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (quotation marks and citations omitted). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (quotation marks). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citation omitted). Furthermore, pursuant to section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme

7

Court.  Id.  Habeas relief is not appropriate unless each ground that supported the state-court's decision is examined and found to be unreasonable under the AEDPA.  See Wetzel v. Lambert, 132 S. Ct. 1195, 1199 (2012).

"If this standard is difficult to meet, that is because it was meant to be."  Harrington, 131 S. Ct. at 786.  Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from re-litigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents.  Id.  Indeed, section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  Id. (quotation marks omitted).  Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law."  Woodford v. Viscotti, 537 U.S. 19, 24 (2002).  Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state-court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington, 131 S. Ct. at 786-787.

Finally, in reviewing petitioner's claims, this Court must remember that under the federal constitution, petitioner was "entitled to a fair trial but not a perfect one."  Lutwak v. United States, 344 U.S. 604, 619 (1953).

## IV.  ANALYSIS

### A.  Claims 1 and 2:  The Confrontation Clause and Related Ineffective Assistance Claim

8

Petitioner first claims that counsel failed to object to the fingerprint analysis testimony given by Lt. Robert May in place of Sgt. Amanda Crooker, who was unavailable, as well as counsel's failure to seek a postponement to allow time to produce Crooker for cross-examination.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two-prong test.  First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 687 (1984).  In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance.  Id.  In other words, Petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy.  Strickland, 466 U.S. at 689.  Second, the defendant must show that such performance prejudiced his defense.  Id. To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  "Strickland's test for prejudice is a demanding one. 'The likelihood of a different result must be substantial, not just conceivable.'"  Storey v. Vasbinder, 657 F.3d 372, 379 (6th Cir. 2011) (quoting Harrington, 562 U.S. at 112).  The Supreme Court's holding in Strickland places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. See Wong v. Belmontes, 558 U.S. 15, 27 (2009).

Petitioner first contends that his confrontation rights were violated when counsel failed to

9

object to testimony given by a fingerprint expert who did not perform the original fingerprint analysis, claiming that trial counsel should have objected to keep the fingerprint evidence out, or, in the alternative, obtain a postponement of the trial until the analyst could be confronted. Lt. May, Crocker's supervisor, testified in Crooker's absence. In his second claim, Petitioner alleges that he was also denied the right to confront the analyst who did the fingerprint analysis.

When the prosecutor indicated that Lt. Robert May would be testifying for Sgt. Amanda Crooker, who was unavailable due to National Guard service, the prosecutor stated that Lt. May did a "second double check" of the analysis performed by Sgt. Crooker. 06/06/2011 Trial Tr. at 7 (Dkt. 12-6) Trial counsel was asked if he wanted to object and indicated that he would not object.

The Michigan Court of Appeals rejected Petitioner's confrontational claim finding:

> This decision by counsel was a waiver of the confrontation right . . . ("[I]f the decision constitutes reasonable trial strategy, which is presumed, the right of confrontation may be waived by defense counsel as long as the defendant does not object on the record.").

Hardy, 2013 WL 1137177, at *1.

That court further found a sound basis for counsel's decision to let May testify in lieu of Crooker:

> May was Crooker's supervisor, so he could readily testify about fingerprint analysis. Also, May specifically reviewed the fingerprint analysis and testified about his findings and conclusions on the basis of that review. In sum, we conclude that the confrontation issue was waived, and that counsel's conduct regarding the issue was reasonable trial strategy.

Id.

With respect to Petitioner's Confrontation Clause claim, assuming that the trial court erred in permitting May to testify in lieu of Crooker about the fingerprint analysis, any error in

the admission of this testimony was harmless.

A violation of the Confrontation Clause can be harmless error.  Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).  For purposes of determining whether federal habeas relief must be granted to a state prisoner on the ground of federal constitutional error, the appropriate harmless-error standard to apply is whether the error had a substantial and injurious effect or influence in determining the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637-638 (1993).  May's testimony concerning the fingerprint analysis evidence was harmless error at most, in light of the fact that May reviewed the analysis and testified about his findings and conclusions based on the review.  Crooker's fingerprint analysis was cumulative of the fingerprint testimony offered by May, who was subject to cross-examination at Petitioner's trial.  Thus, any possible Confrontation Clause error in failing to produce Crooker to testify was harmless error.  See United States v. Barnes, 183 F. App'x 526, 530-531 (6th Cir. 2006).

"The prejudice prong of the ineffective assistance analysis subsumes the Brecht harmless-error review."  Hall v. Vasbinder, 563 F.3d 222, 236 (6th Cir. 2009).  Because the admission of Crooker's out-of-court analysis was harmless error, Petitioner cannot satisfy Strickland's prejudice requirement.  See, e.g., Bell v. Hurley, 97 F. App'x 11, 17 (6th Cir. 2004). Petitioner was not prejudiced by counsel's failure to object to the admission of Crooker's analysis at trial.  Furthermore, May reviewed and submitted findings of the fingerprint analysis. To produce Crooker for purposes of cross-examination, in addition to the review and testimony provided by May, would be cumulative.  Therefore, Petitioner is not entitled to habeas relief on his first or second claims.

**B.  Claims 3 and 4:  The Public Trial Claim and the Related Ineffective Assistance of Counsel Claim**

Petitioner claims that his right to a public trial was violated by a partial closure of the courtroom during jury selection and trial counsel's failure to object to the partial closure.

Petitioner is not entitled to relief on his public trial claim, because there was only a partial closure of the courtroom.  The trial court judge allowed Petitioner and the prosecutor two spectators with an understanding that the number could be revisited as the jury pool in the courtroom decreased.

"The central aim of a criminal proceeding must be to try the accused fairly."  Waller v. Georgia, 467 U.S. 39, 46 (1984).  The Sixth Amendment public-trial guarantee was created to further that aim.  Id.  A public trial helps to ensure that judges and prosecutors carry out their duties responsibly, encourages witnesses to come forward, and discourages perjury.  Id.  The violation of the constitutional right to a public trial is a structural trial error, not subject to the harmless-error analysis.  Id. at 49-50 & n.9.

In Presley v. Georgia, 558 U.S. 209, 216 (2010), the Supreme Court held that a criminal defendant's Sixth Amendment right to a public trial was violated when the trial court excluded the public from the voir dire of prospective jurors, when the court failed to consider reasonable alternatives to closure.

Furthermore, courts take "very seriously a defendant's right to have family and friends present at trial."  See Carson v. Fischer, 421 F.3d 83, 91 (2nd Cir. 2005); see also Guzman v. Scully, 80 F.3d 772, 776 (2nd Cir. 1996)("The exclusion of courtroom observers, especially a defendant's family members and friends, even from part of a criminal trial, is not a step to be taken lightly.").  It would be an unreasonable interpretation of Waller for a court to exclude a defendant's relatives "if the exclusion of that particular relative, under the specific circumstances at issue, is not necessary."  See Yung v. Walker, 468 F.3d 169, 177 (2nd Cir. 2006).

Waller, however, involved a full, rather than a partial, closure of the courtroom to the public.  See Drummond v. Houk, 797 F.3d 400, 402 (6th Cir. 2015).  There is no clearly established Supreme Court law as to how the rules in Waller apply in cases, like Petitioner's, where some spectators, but not all of them, were removed from the courtroom.  Id. at 403.  As the Sixth Circuit indicated:

> The Supreme Court's case law does not clearly establish, for example, whether in such cases the trial court must identify an "overriding" interest favoring closure, as in Waller, or instead only a "substantial" interest, as some circuit courts have inferred, or perhaps even some lesser interest.  Likewise unclear — and thus not clearly established — is whether the closure must be "narrowly tailored," as the Court required in Waller, or whether in partial-closure cases a somewhat looser cut will do.  And on the procedural side, Waller says the court must make "findings adequate to support the closure."  But "adequate" is a vague and therefore elastic term; and for all the Ohio courts knew here, "adequate" might mean one thing in full-closure cases, and a different and less rigorous thing when the closure is only partial.

Id. at 403 (internal citations omitted).

Indeed, "there are reasonable arguments, that Waller does not apply to partial-closure cases in the wholesale manner" and the only principle from Waller that was clearly established for purposes of the partial closure was the general one that the trial court must balance the interests favoring closure against those opposing it.  Id. at 404.

In United States v. Cervantes, 706 F.3d 603, 612-613 (5th Cir. 2013), the Fifth Circuit held that the federal district court did not deprive defendants of their right to public trial when it partially closed the courtroom during voir dire.  The Fifth Circuit ruled that the court's concerns regarding available space within the courtroom, the nature of proceedings, the desire to minimize disruptions, and the panel members' comfort and safety were substantial reasons to defend a partial closing of proceedings, and the court allowed each of three defendants to have three

13

relatives present in courtroom during voir dire.

Petitioner is not entitled to relief, because there was no complete closure of the courtroom. And the Michigan Court of Appeals found that the trial court gave adequate reasons for the partial closure:

> In this case, before the jury venire entered the courtroom, the trial court explained to counsel that because of space constraints, the large number of potential jurors, and the public interest in the trial, the courtroom would not be able to accommodate everyone. As a result, the trial court limited both sides to two supporters each, for a total of four members of the public, and indicated that, as the number of potential jurors decreased, "we can certainly expand matters." The trial court did not specifically ask defense counsel or the prosecution whether they had any objections, and neither attorney objected to this closure of the courtroom.

Hardy, 2013 WL 1137177, at *2.

The judge gave adequate reasons for a partial closure of the courtroom during voir dire. Petitioner is not entitled to relief on his third claim.

The Court also rejects Petitioner's related ineffective assistance of counsel claim. Even if a reasonable attorney would have viewed the partial closure as a potential Sixth Amendment violation, "competent counsel could have knowingly and reasonably declined to raise the constitutional issue in this case because doing so would be a waste of the defense's time, energy, and resources." Bucci v. United States, 662 F.3d 18, 31 (1st Cir. 2011). Counsel could well have concluded that the presence of Petitioner's family members mitigated the risk of actual prejudice to Petitioner and that he had very little to gain from opening the courtroom to additional members of the public. Petitioner's counsel could have reasonably concluded that challenging the partial courtroom closure would have done little to increase Petitioner's chances of securing a not-guilty verdict. Id. at 31-32. Defense counsel was not ineffective for failing to

object to the partial closure of the courtroom.  Therefore, Petitioner's third and fourth claims are without merit.

### C.  Claims 5 and 6:  The Prosecutorial Misconduct Claims[2]

In his fifth claim, Petitioner alleges that the prosecutor committed misconduct by withholding the pre-trial testimony of Harrison, given in response to an investigation subpoena, which Petitioner claims was material to his defense, which underminded the fairness of the trial and rendered the verdict unreliable, thereby depriving Petitioner of due process.

To prevail on his claim, Petitioner must show (i) that the state withheld exculpatory evidence and (ii) that the evidence was material either to guilt or to punishment irrespective of good faith or bad faith of the prosecution.  Brady v. Maryland, 373 U.S. 83, 87 (1963).  Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A "reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 683 (1985).

In Strickler v. Greene, the Supreme Court articulated three components (or essential elements) of a Brady claim: (i) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (ii) the evidence must have been suppressed by the State, either willfully or inadvertently; and (iii) prejudice must have ensued. 527 U.S. 263, 281-282 (1999).

In the present case, the prosecutor's failure to disclose Harrison's pretrial investigative subpoena testimony did not deprive Petitioner of a fair trial, because the contents of the

---

[2] For purposes of analysis, the Court will consolidate claims 5 and 6 because they are interrelated.

investigative subpoena testimony were not exculpatory.  See, e.g., Farrell v. United States, 162 F. App'x 419, 424 (6th Cir. 2006); Lockett v. Stegall, 100 F. App'x 360, 362 (6th Cir. 2004).

While Petitioner claims that the prosecutor withheld pretrial testimony of Harrison given in response to an investigating subpoena, the Michigan Court of Appeals found that such evidence could have been discovered by Petitioner and his counsel with reasonable diligence. Hardy, 2013 WL 1137177, at *4.  The court also found that Petitioner failed to show "any probability that the outcome of his trial would have been different it the defense had received this evidence."  Id.

The contents of Harrison's prior testimony were not exculpatory and the prosecution presented significant evidence linking Petitioner to the crime — namely, that Petitioner's DNA was recovered from the sweatshirt, sweatpants, and clothes found in the alley near the shooting. A gun recovered near the clothing contained bullets similar to a bullet found in the victim's arm. Petitioner's fingerprint was recovered from a Doritos bag located in a pocket of the sweatshirt, similar to the bags sold in the vending machine at Harrison's barbershop.  In light of this evidence, Petitioner failed to show that the outcome of the trial would have been different had Harrison's investigative subpoena testimony been disclosed to him.  See, e.g., Farrell v. United States, 162 F. App'x 419, 424 (6th Cir. 2006).  Moreover, the prior testimony would have been cumulative of other evidence that was used to impeach Harrison, and was only marginally relevant.  See Puertas v. Overton, 168 F. App'x 689, 696 (6th Cir. 2006).

The prosecutor raised Harrison's initial identification of Brown as the shooter, and defense counsel cross-examined on the initial identification, as well as the subsequent line-up identification where Harrison identified two individuals as possibly being the shooter. Harrisons' credibility of his ability to identify the shooter had already been called into question.

16

Introduction of the impeachment evidence would not have altered the outcome of Petitioner's trial. "[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir.2000). Petitioner has not established a <u>Brady</u> violation. The impeachment evidence cannot be shown to be material. Nor can Petitioner demonstrate how introducing this evidence would have resulted in a different outcome of his trial. Petitioner is not entitled to relief on his fifth claim.

Petitioner's sixth claim alleges that several statements made by the prosecutor during closing argument constituted prosecutorial misconduct, thereby denying Petitioner of a fair trial.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." <u>Millender v. Adams</u>, 376 F.3d 520, 528 (6th Cir. 2004). A prosecutor's improper comments will be held to violate a criminal defendant's constitutional rights only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986). Thus, prosecutorial misconduct will form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. <u>Donnelly v. DeChristoforo</u>, 416 U.S. at 637, 643-645 (1974). In order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Parker v. Matthews</u>, 132 S. Ct. 2148, 2155 (2012).

Petitioner contends that the prosecutor improperly argued to the jury that the trial court

17

stated that Petitioner caused the victims's death.  On appeal, the prosecution alleged that the court reporter erroneously transcribed the prosecutor's statement and that the remark was in reference to the trial court's reading of the felony information at the beginning of the trial.

Petitioner is not entitled to habeas relief on his claim that the prosecutor committed misconduct based on this remark because the remark (if made) was isolated and the evidence against Petitioner in this case was strong.  See Macias v. Makowski, 291 F.3d 447, 453-454 (6th Cir. 2002); Byrd, 209 F.3d at 536.  Furthermore, any prosecutorial misconduct in suggesting that the trial court stated that Petitioner caused the victim's death was ameliorated by the trial court's instruction that the lawyers' and trial court's comments and instructions were not evidence.  See Hamblin v. Mitchell, 354 F.3d 482, 495 (6th Cir. 2003).   The prosecutor's comments did not deny Petitioner of a fair trial.  Therefore, Petitioner is not entitled to relief on his sixth claim.

### D.  Claim 7:  The Additional Ineffective Assistance of Counsel Claims

Petitioner also alleges that trial counsel was ineffective throughout trial, claiming that the record discloses some, but not all, of the facts that demonstrate the ineffectiveness, listing that trial counsel was ineffective for failing to investigate, failing to file pre-trial motions, and failing to object to the prosecutor's improper remarks during closing argument.

Petitioner claims that defense counsel knew there was another individual, Brown, who had been charged with the shooting and failed to properly investigate this matter.  The record shows that when discussing discovery issues, defense counsel knew about Brown being the initial suspect in the case.  Defense counsel mentioned that she was missing the lineup sheets and photos for the lineup conducted when Brown was arrested as the first suspect.  Thus, Defense counsel did investigate Brown during discovery.

Even if defense counsel had failed to investigate properly, the error would not constitute

18

ineffective assistance of counsel, because Petitioner failed to show that the investigatory failures prejudiced him.  A habeas petitioner cannot show deficient performance or prejudice resulting from counsel's failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material to his or her defense.  See Hutchison v. Bell, 303 F.3d 720, 748 (6th Cir. 2002).  Petitioner cannot prevail on his claim that trial counsel was ineffective for failing to adequately prepare the case or conduct a minimal investigation, because he has failed to show how additional pretrial work, which counsel had allegedly been deficient in failing to perform, would have been beneficial to his defense.  See Martin v. Mitchell, 280 F.3d 594, 607-608 (6th Cir. 2002).

To the extent that Petitioner claims that trial counsel should have brought in evidence to show that Harrison had initially identified Brown as the shooter, Petitioner would not be entitled to relief, because Harrison was questioned about the fact that he initially identified Brown as the shooter and later picked out two persons at the live line-up that included Petitioner.  Undisclosed impeachment evidence is considered cumulative "when the witness has already been sufficiently impeached at trial."  Davis v. Booker, 589 F.3d 302, 309 (6th Cir.  2009).  Because Harrison's credibility already had been impeached, Petitioner was not prejudiced by counsel's failure to impeach Harrison with cumulative impeachment evidence.  Id.

Furthermore, substantial evidence linked Petitioner to the inside of the barbershop, to the DNA found on clothing, the fingerprint evidence on a snack bag that was possibly from a vending machine inside the barbershop that had been broken into, a page from a magazine found in the clothing, which was determined to have come from a magazine inside the barbershop, and a gun found near these items in the alley with a bullet from the gun found in the victim's arm.  Although Harrison's credibility regarding his ability to identify the shooter was significantly

19

called into question with evidence that Harrison initially identified Brown as the shooter and later identified two individuals during the live lineup that included Petitioner, it is not reasonably probable that the initial identification would cause the jury to disbelieve Harrison's factual account of the shooting such that the result would have been different.

Petitioner also claims that trial counsel did not file pretrial motions for a continuance to investigate witnesses. However, the record reflects that counsel had an investigator looking for witnesses and the decision not to file for a continuance may have resulted from trial strategy. Furthermore, Petitioner has not shown that additional witnesses would have effected the outcome of his trial, in light of the physical evidence presented. Nor has Petitioner provided the names or substance of the proposed testimony in support of his claim.

In regards to Petitioner's allegation that defense counsel should have called additional witnesses, or failed to file a proper alibi notice, Petitioner has failed to attach any offer of proof or any affidavits sworn by any proposed witness. Petitioner has not offered, either to the Michigan courts or to this Court, any evidence beyond his own assertions as to whether additional witnesses would have been able to testify and what the content of these witnesses' testimony would have been. In the absence of such proof, Petitioner is unable to establish that he was prejudiced by counsel's failure to call any additional witnesses to testify at trial, so as to support the second prong of an ineffective assistance of counsel claim. See Clark v. Waller, 490 F.3d 551, 557 (6th Cir. 2007).

Petitioner further claims that trial counsel was ineffective for failing to object to prosecutorial misconduct. This Court has already determined that the prosecutor's comments did not deprive Petitioner of a fundamentally fair trial; Petitioner is unable to establish that he was prejudiced by counsel's failure to object to these remarks. See Slagle v. Bagley, 457 F.3d 501,

528 (6th Cir. 2006).

Petitioner next claims that trial counsel was ineffective for failing to challenge the 12-month delay between Petitioner's crime and his arrest.

This Court initially notes that Petitioner has neither alleged nor established a violation of his Sixth Amendment right to a speedy trial, because he was not actually arrested and charged with this crime until March 7, 2011.[3]  Petitioner was brought to trial three months later.  The Supreme Court has noted that it is "[e]ither a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment."  United States v. Marion, 404 U.S. 307, 320 (1971).  Therefore, although the invocation of the Speedy Trial Clause of the Sixth Amendment need not await indictment, information or other formal charge, the provision of the Speedy Trial Clause does not apply to the period prior to arrest.  Id.

The Due Process Clause, however, provides a limited role in protecting criminal defendants against "oppressive" pre-arrest or pre-indictment delay.  United States v. Lovasco, 431 U.S. 783, 789 (1977).  Proof of prejudice is generally a necessary, but not sufficient, element of a due process claim involving pre-indictment delay, and the due process inquiry must consider the reasons for the delay as well as prejudice to the accused.  Id. at 790.

The Sixth Circuit has consistently read Lovasco to hold that dismissal for pre-indictment delay is warranted only when the defendant shows: (i) substantial prejudice to his right to a fair trial; and (ii) that the delay was an intentional device by the government to gain a tactical advantage. United States v. Brown, 959 F.2d 63, 66 (6th Cir. 1992).  The Sixth Circuit has repeatedly held that where the pre-indictment delay is caused merely by negligence on the part of

---

[3] See Docket Sheet, Case # 11-002921-01, at 1 (Dkt. 12-1).

prosecutors or police, no due process violation exists.  United States v. Rogers, 118 F.3d 466, 476 (6th Cir. 1997) (rejecting the argument that "reckless or negligent disregard of a potentially prejudicial circumstance violates the Fifth Amendment guarantee of due process"); United States v. Banks, 27 F. App'x 354, 357 (6th Cir. 2001) ("Our Circuit has recognized that where delay is due to simple negligence and not a concerted effort by the government to gain an advantage, no due process violation exists.").  Finally, where a habeas petitioner fails to show that the prosecutor delayed the prosecution for illegitimate reasons, it is unnecessary for a court to determine whether the petitioner satisfies the "substantial prejudice" requirement.  Wolfe v. Bock, 253 F. App'x 526, 532 (6th Cir. 2007) (no due-process deprivation of right to fair trial when petitioner failed to establish that 15-year delay between murder and his arrest was for illegitimate reasons).  A defendant who seeks dismissal of criminal charges based on pre-charging or pre-indictment delay has the burden of demonstrating that the delay between the crime and the indictment was an intentional device on the part of the prosecution to gain a decided tactical advantage in its case.  United States v. Schaffer, 586 F.3d 414, 425-426 (6th Cir. 2009).

Because Petitioner does not allege or show that the police or prosecutor intentionally delayed charging him in order to gain a tactical advantage over his case, trial counsel was not ineffective for failing to challenge the pre-charging delay.  See Lenoir v. Warden, S. Ohio Corr. Facility, 886 F. Supp. 2d 718, 735 (S.D. Ohio 2012).  Therefore, Petitioner is not entitled to relief on his seventh claim.

### E.  Certificate of Appealability and Leave to Proceed In Forma Pauperis on Appeal

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue.  See 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A certificate of

appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See* Slack v. McDaniel, 529 U.S. 473, 484-485 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. Id. at 336-337.

Likewise, when a district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claims, a certificate of appealability should issue, and an appeal of the district court's order may be taken, if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. Slack, 529 U.S. at 484. When a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petition should be allowed to proceed further. In such a circumstance, no appeal would be warranted. Id.

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254. Having considered the matter, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right. Accordingly, a certificate of

appealability is not warranted in this case.

Although this Court will deny a certificate of appealability to petitioner, the standard for granting an application for leave to proceed in forma pauperis ("IFP") is a lower standard than the standard for certificates of appealability. Foster v. Ludwick, 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002). Whereas a certificate of appealability may only be granted if Petitioner makes a substantial showing of the denial of a constitutional right , a court may grant IFP status if it finds that an appeal is being taken in good faith. Id. at 764-765; 28 U.S.C. § 1915(a)(3); Fed. R. App.24 (a). "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits. Foster, 208 F. Supp. 2d at 765. Although jurists of reason would not debate this Court's resolution of Petitioner's claims, the issues are not frivolous; therefore, an appeal could be taken in good faith and petitioner may proceed in forma pauperis on appeal. Id.

## V.   CONCLUSION

For the reasons stated above, the Court denies the petition for writ of habeas corpus (Dkt. 1). The Court also declines to issue of certificate of appealability, but grants Petitioner leave to appeal in forma pauperis.

SO ORDERED.


Dated:  December 17, 2015                      s/Mark A. Goldsmith
       Detroit, Michigan                      MARK A. GOLDSMITH
                                            United States District Judge

24

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 17, 2015.

<u>s/Karri Sandusky</u>
Case Manager

25